**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PROSOURCE TECHNOLOGIES, LLC,**

                                        **Plaintiff,**

        **v.**                                                    **1:17-CV-00629**

**CERTAIN UNDERWRITERS AT LLOYD'S**
**LONDON, Subscribing to Policies**
**PGIARK04292-00 and PGIXS00178-00,**

                                        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

**I.    INTRODUCTION**

        This diversity action arises out of an insurance coverage dispute between Plaintiff

ProSource Technologies, LLC ("ProSource") and its professional liability insurer, Defendant

Certain Underwriters at Lloyd's London ("Underwriters").  ProSource seeks recovery from

Underwriters for a portion of an $11.9 million settlement it entered into with New York's

Housing Trust Fund Corporation ("HTFC").  _See_ Am. Compl., Dkt. No. 79.  Underwriters

moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the action, asserting that it is not

obligated to pay ProSource for its loss.  Dkt. No. 81.  ProSource opposes the motion, Dkt.

No. 82, and Underwriters filed a reply.  Dkt. No. 83.  For the reasons that follow, the motion

is granted in part and denied in part.

**II.    STANDARD OF REVIEW**

1

On a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted). This tenet does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

III.    **BACKGROUND**

ProSource is a Minnesota-based consulting firm, specializing in disaster and emergency management services. In April 2013, the State of New York, through HTFC, hired ProSource to help administer two disaster relief fund programs to aid SuperStorm Sandy victims: the "Buy-Out Program" and the "Rehabilitation Program." Am. Compl. ¶ 18. The concept of the Buy-Out Program was that HTFC would use HUD funds to buy and demolish "eligible" properties—that is, properties that were in areas prone to flooding and storm surge. *Id.* Under the Rehabilitation Program, HUD funds would be disbursed to eligible property owners to assist with repair and rehabilitation of damaged properties. *Id.* ProSource was responsible for reviewing applications to determine whether applicants were

eligible for these programs, and if so, to determine whether to disburse funds. *Id.*

ProSource's contract for this work was in the nature of a time-and-materials contract in that

ProSource was to be paid for the hours its employees worked, at agreed-upon billing rates,

plus approved expenses. *Id.* ProSource was required to insure that its work complied with

applicable state and federal law, including eligibility standards. *Id.* ¶ 47.

ProSource purchased professional liability coverage from Underwriters to protect it

from any errors and omissions that arose from the professional services it provided.

Underwriters issued primary and follow-form excess professional liability coverage with total

limits of $7 million. *Id.* ¶¶ 22, 27.[1]  Collectively, the Primary Policy and the Excess Policy

are referred to as "the Policies."

Under the professional liability insuring agreement, Underwriters agreed that:

WE will pay on YOUR behalf all DAMAGES that YOU are legally obligated to pay as
a result of CLAIMS provided that:

(1)     the CLAIM was first made against YOU during the POLICY PERIOD and
        reported to US during the POLICY PERIOD;

(2)     the CLAIM arises out of an actual or alleged WRONGFUL ACT with respect to
        PROFESSIONAL SERVICES rendered…by you….

* * *

DAMAGES means the monetary amounts for which YOU may be held liable,
including sums paid as judgments, awards, or settlements but does not include:

1.      the restitution, return, withdrawal or reduction of fees, profits, or charges for
        services rendered or offered by YOU or any other consideration or expenses
        paid to YOU for services or goods….

---

[1]The Primary Policy is for the period November 1, 2014 through November 1, 2015. Am. Compl. ¶ 22.
For professional liability, it provides a limit of $3,000,000 for defense costs for each claim (subject to a
$10,000 deductible) and provides a separate limit of $3,000,000 for "Damages." *Id.*  Underwriters also
issued a "Following Form Excess Policy" for the same period, policy number PGIXSOO 178-00 (the "Excess
Policy"). *Id.* ¶ 27. The Excess Policy has an aggregate limit  for "damages" of $4,000,000 and has no limit for
defense costs. *Id.*

Kohane Ex. 1 (Policy),  at 72-73.

As to settlement, the policy provides: "WE will not settle or compromise any CLAIM without YOUR consent. YOU shall do nothing to prejudice OUR rights under this policy nor shall YOU admit liability or settle any CLAIM without our written consent."  Am. Compl. ¶ 23. The Definitions section defines a "Claim" as "any demand received by YOU alleging liability or responsibility on YOUR part for DAMAGES arising from PROFESSIONAL SERVICES." *Id.* ¶ 25.  The Policy further provides that "WE shall have the right and duty to assume the adjustment, defense and settlement of any CLAIM to which this insurance applies."  *Id.* ¶ 26.

HTFC refused to pay ProSource for some of the amounts billed under the contract because of alleged billing errors and other technical issues, such as different labor descriptions, invoices submitted more than 30 days after an expense was incurred, and subcontractor invoices not paid until State-mandated contract amendments were signed. *Id.* ¶ 19.  No mention was made at that time of issues with ProSource's performance.  *Id.*  In November 2014, ProSource sued HTFC in the Supreme Court of the State of New York (Commercial Division), Albany County, seeking payment of the unpaid contract amount and applicable New York statutory interest.  *Id.* ¶ 20.  ProSource contended that it was owed approximately $24 million. *Id.* ¶ 73.

In October 2015, after HTFC's partial motion to dismiss was granted in the state court, HTFC answered the complaint and asserted a counterclaim ("the Counterclaim") against ProSource contending that it had "suffered millions of dollars in damages, in an amount. . . in excess of $35 million."  *Id.* ¶ 21.  "The Counterclaim alleged that ProSource

had committed various billing process errors and had failed to properly perform services as promised." *Id.*; *see also* Kohane Aff., Ex. 4, dkt. # 81-6 (Counterclaim).  ProSource refers to the allegations in the Counterclaim about billing process errors as "the Billing Claim." Am. Compl. ¶ 2.  Although the Counterclaim included an allegation that ProSource had allegedly billed "for work that was not properly performed or documented as required by the Contract and applicable HUD regulations," details about this allegation were not included the Counterclaim. *Id.*  ¶ 52.  As explained below, ProSource came to understand that this concerned allegations that ProSource made improper eligibility determinations under the HUD programs, and thus ProSource refers to this allegation as "the Ineligibility Claim."  *Id.* ¶ 53

On October 30, 2015, ProSource notified Underwriters and Underwriters' claim handler, Premier Claims Management ("Premier"), of the Counterclaim and sought coverage under the Policies. Am. Compl. ¶ 28.  In a letter dated December 14, 2015, Underwriters agreed to defend ProSource under a reservation of rights, stating specifically that "[t]he Policy's definition of DAMAGES does not include the 'restitution, return, withdrawal or reduction of fees, profits or charges for services rendered or offered by [ProSource].'" *Id.* ¶ 29.  ProSource contends that "[n]othing in the letter suggested to ProSource that if it settled HTFC's affirmative damage claim by foregoing fees it was entitled to be paid, the policies would not cover the settlement." *Id.* ¶ 30.  On February 21, 2016, Newsday published an article that indicated that HTFC was sending notices to more than a thousand SuperStorm Sandy victims saying that the victims might have to repay $59 million in funds improperly awarded to them. *Id.*  ¶ 53.  The article "suggested to ProSource

that the real focus of HTFC's Counterclaim might be allegedly improper payments—the Ineligibility Claim—which was later confirmed by HTFC." *Id.* ProSource contends that HTFC "had a strong incentive to not put its allegations about the Ineligibility Claim into writing" because it did not want to "expose itself to intense public outrage and to an admission of liability to HUD for improperly disbursed funds." *Id.* ¶ 54. "Instead, for support for its Ineligibility Claim, HTFC initially pointed to two preliminary HUD government audit reports." *Id.* ¶ 55. These audit reports stated that with respect to review of a sample of Buy-Out Program files, HUD took issue with $18.7 million of payments. *Id.* Referencing a sample of Rehabilitation Program files, HUD noted that approximately $185 million appeared to have been overpaid. *Id.* A full HUD audit of was scheduled for August 2016, which ProSource believed could potentially increase HTFC's damages. *Id.* ProSource extrapolated from the government audit reports that it "was facing exposure that could be over $100 million— far in excess of the Billing Claim and of ProSource's own $24 million contract claim." *Id.* ¶ 56.

From December 2015 into April 2016, ProSource provided Premier and Underwriters with documents and discovery in the state court litigation, and advised of the developments in the case including a mediation and a deposition of a key witness, but Underwriters did not actively defend the case, help ProSource strategize, or respond to settlement overtures. *Id.* ¶¶ 33-48. In April 2016, ProSource's litigation counsel ("Litigation Counsel") advised Premier that the HTFC case "was at  a key inflection point—that is, the initial discovery deadline was close at hand, HTFC had counterclaimed, and additional parties and claims were soon to be added. Given these points, Litigation Counsel recommended that

Underwriters reserve $10 million for aggregate defense and liability coverage.  Litigation

Counsel advised Premier that before the risk and potential expense increased dramatically,

it made sense to thoughtfully consider settlement of the case, including the Counterclaim."

*Id.* ¶ 49.  Underwriters "did not express any disagreement with Litigation Counsel's strategy.

Instead, Underwriters took in the extensive information provided to it, always kept claiming it

needed more, and would not substantively commit to engage in the defense or settlement

of the case."  *Id.* ¶ 50.   ProSource engaged coverage counsel in April 2016 to assist with

insurance coverage issues, but this counsel was unable to obtain Underwriters' direction in

handling the underlying litigation.  *Id.* ¶ 51.  "ProSource's evolving realizations about the risk

presented by the Ineligibility Claim alone were described to Underwriters" in early April.  *Id.*

¶ 57.

> On April 28, 2016, HTFC sent ProSource a confidential letter providing its own
> analysis of disbursements to a certain subset of applicants in the Buy-Out Program.
> HTFC alleged that ProSource incorrectly disbursed $559,000 to ten applicants. In the
> course of its role in the Buy-Out Program, ProSource serviced approximately 1,389
> applicants.  By extrapolation, ProSource understood that HTFC implied that
> ProSource incorrectly disbursed over $70 million to ineligible applicants in the
> Buy-Out Program alone.

*Id.* ¶ 58.

"In late April 2016, HTFC's lead counsel suggested to ProSource's Litigation Counsel

that HTFC was prepared to settle the case, meaning that HTFC intended to extract $13

million from ProSource for the Counterclaim."  *Id.*  ¶ 59.   "Given the increasing risks and

costs" of litigating the matter, ProSource concluded that it made sense to attempt to settle

the case before the initial discovery period closed in May 2016.  *Id.*  In April and into May

2016, ProSource' s Litigation Counsel "repeatedly advised Underwriters of the opportunity

and need to settle the case at that point and requested that Underwriters provide direction

on how to proceed.  Underwriters ignored these requests and did not respond until the week

of May 9, 2016, when it required . . .  a written proposal from HTFC before it could provide

input how to proceed."  *Id.* ¶ 60.  "ProSource explained to Underwriters that HTFC was

unwilling to put the offer in writing due to conflicts within HTFC about the offer and again

sought direction about how ProSource should proceed.  ProSource also informed

Underwriters that HTFC wanted a response to its settlement demand by May 18, 2016."  *Id.*

¶ 61.  Rather than give direction as requested, Underwriters insisted that ProSource work

with new counsel chosen by Underwriters.  *Id.* ¶ 62.  Litigation Counsel brought this new

counsel up to speed on the case, but neither the new counsel nor Underwriters gave

ProSource the direction on how to respond to HTFC's settlement demand.  *Id.*

ProSource was able to obtain an extension until May 23, 2016 for ProSource's

response to  HTFC's settlement demand, and Underwriters agreed that Litigation Counsel

could be the one to convey HTFC's settlement demand in writing for Underwriters

consideration.  *Id.* ¶¶ 64-68.  Underwriters did not respond to the written settlement

demand, but instead insisted that its newly-appointed counsel participate in the upcoming

settlement discussions with HTFC.  *Id.* ¶ 69.  ProSource was concerned that a new attorney

in the negotiations would be detrimental, and Underwriters' counsel refused to confirm that

he would have settlement authority if he participated in the settlement discussions.  *Id.* ¶ 70.

Underwriters also refused to give ProSource any authority to settle, or direction on how to

handle the settlement. *Id.*

ProSource began to believe that Underwriters "had no intention of acting in good

faith, participating in the case, or making a counter offer to HTFC's proposal," believing

instead that Underwriters wanted to force ProSource to choose between facing the risk of

liability for the Ineligibility Claim in excess of the Policies' limits, or settling without

Underwriters consent. *Id.* ¶ ¶ 70-71. Plaintiff contends that "[g]iven the enormous downside

of losing the opportunity to settle, and Underwriters' refusal to participate and pay defense

costs, ProSource felt it had no choice but to settle." *Id.* ¶ 73.

> On May 24, 2016, ProSource and HTFC reached an agreement in principle to
> settle the Underlying Litigation, and ProSource immediately informed
> Underwriters about the resolution. Under the settlement, HTFC would pay
> ProSource $12.5 million. As of the time of settlement, ProSource's contract
> claim against HTFC totaled $24,361,467.00, including interest. In other words,
> HTFC acknowledged that ProSource was entitled to recover the full amount of
> its unpaid bills plus interest. Thus, the settlement agreement provides that the
> difference between the $24,361,467.00 and the $12.5 million reflects a
> payment on the Counterclaim of $11,861,467.00, by ProSource foregoing
> amounts that it was entitled to collect.

*Id.*

It took several weeks to finalize the settlement agreement and, during this period,

ProSource provided Underwriters with a copy of the draft settlement agreement. *Id.* ¶ 75.

In response, Underwriters threatened that if ProSource executed the agreement,

Underwriters would (1) take the position that ProSource entered into a settlement without

Underwriters' consent and would consider ProSource to have forfeited coverage; (2) seek

judicial intervention regarding the settlement; and (3) directly contact HTFC. *Id.* "When

ProSource pointed out how such actions would breach Underwriters' duties, Underwriters

ultimately decided not to take the threatened actions." *Id.*

On June 16, 2016, ProSource settled with HTFC. Lonergan Decl. Ex. A. The

Settlement Agreement provides in pertinent part:

3.  Payment.  HTFC will pay funds in the total amount of $12,500,000.00 (the "Settlement Amount") to ProSource by means of a wire transfer . . . . The ProSource contract claim plus interest as of May 31, 2016 totals $24,361,467.00.  HTFC, through its counterclaim, seeks damages from ProSource. The difference between ProSource's contract claim and the $12.5 million paid to ProSource reflects an offset in favor of HTFC of $11,861,467.00 based upon and allocated to its counterclaim.

*Id.* ¶ 3.

ProSource maintains that "[a]t least $7 million of the $11,861,467.00 difference represents ProSource's 'Damages' under the Policies. . . . [but] Underwriters has refused to pay any part of the $11,861,467.00."  Am. Compl. ¶ 74.  ProSource further maintains that while Underwriters acknowledged its duty to defend, it initially refused to pay any defense costs. *Id.* ¶¶ 76-78.  "After the Underlying Litigation was settled, . . . Underwriters paid certain legal fees and costs associated with the Counterclaim before this dispute was mediated or this action was filed. Underwriters subsequently paid additional legal fees and costs associated with the Counterclaim under a settlement agreement the parties entered into on January 6, 2017.  ProSource, however, has incurred, and continues to incur, significant attorneys' fees and expenses in connection with its dispute with Underwriters." *Id.* ¶ 78.

The Amended Complaint contains four causes of action.  The first alleges that Underwriters breached the Policies by its failure to indemnify ProSource for the offset ("the Offset") recognized in the Settlement Agreement.  ProSource's second cause of action asserts that Underwriters breached its duty to defend under the Policies by its failure to timely review and investigate, meaningfully participate in settlement discussions, and authorize settlement. ProSource claims that, on account of the alleged breach of the duty to defend, it is entitled to damages "in an amount to be proven at trial but at least in the

amount of the Policies' $7 million limits." *Id.* ¶ 91.  The third cause of action requests a declaration in ProSource's favor that ProSource was not obligated to obtain Underwriters' written consent prior to entering into this Settlement Agreement.  Finally, ProSource alleges in its fourth cause of action that, if its breach of contract claim is not viable, by reason of Underwriters' alleged breach of the implied covenant of good faith and fair dealing, it is entitled to damages "at least in the amount of the Policies' $7 million limits." *Id.* ¶¶ 101-102.

## IV.    DISCUSSION

### a.    Breach of the Duty to Indemnify - First Cause of Action

Underwriters argues, *inter alia*, that because DAMAGES under the Policies excludes the "reduction of fees, profits or charges for the services rendered or offered by [ProSource]," the Offset is excluded because it represents a reduction of the fees that HTFC owed ProSource for its contract services.

#### 1.    Applicable Law

The Policies' choice-of-law clause mandates that New York law applies to any dispute "over the meaning, interpretation or operation of any term, condition, definition or provision" of the contract.  *See* Kohane Affirmation, Ex 1 at 80-81.  "A federal court sitting in diversity ... must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989).  "Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction." *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 825 N.Y.S.2d 692, 859 N.E.2d 498, 500 (2006) (citation omitted). This is because "[a] basic precept of contract interpretation is that agreements should be construed to effectuate the parties'

11

intent." *Id.* (citations omitted).   As evidenced by the choice-of-law clause, the parties clearly intended New York law to apply to interpretation of the terms of the professional liability agreement covering ProSource's services in New York.   Furthermore, both parties argue that New York law applies to the substantive merits of the first and second causes of action.

Under New York law, an insurance agreement is subject to principles of contract interpretation, and as such, unambiguous policy provisions must be given their plain and ordinary meaning. *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680, 37 N.E.3d 78 (NY 2015).   Insurance contracts must be interpreted consistent with the reasonable expectations of the average insured.  *See Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (NY 2011).   "[A] court may neither make nor vary an insurance contract by extending coverage beyond the fair intent and meaning of the agreement, and the liability of the insurer cannot be enlarged by implication beyond the express terms of the contract.'" *Kula v. State Farm Fire & Cas. Co.*, 212 A.D.2d 16, 19 (4th Dep't 1995), *lv to appeal denied in part and dismissed in part* 87 N.Y. 2d 953 (NY 1996) (interior quotation marks and citation omitted).   Any ambiguities in a provision of an insurance contract are analyzed "under the normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016).   If policy language is ambiguous, "such ambiguities must be construed in favor of the insured and against the insurer." *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 436 (S.D.N.Y. 2016) (citing *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010);

*Handelsman v. Sea Ins. Co.*, 85 N.Y.2d 96, 101 (NY 1994)).

It is the insured's burden to prove that a loss falls within the scope of the coverage granted by a policy. *Munzer v St. Paul Fire and Mar. Ins. Co.*, 145 AD2d 193, 199 (3d Dep't 1989); *U.S. Fid. & Guar. Co. v Ashley Reed Trading, Inc.*, 43 F. Supp 3d 271, 277 (S.D.N.Y. 2014), *aff'd sub nom. U.S. Fid. and Guar. Co. v Fendi Adele S.R.L.*, 823 F3d 146 (2d Cir. 2016). By contrast, the insurer bears the burden of proving the applicability of an exclusion from an otherwise covered loss. *See Servidone Const. Corp. v. Sec. Ins. Co. of Hartford,* 64 N.Y.2d 419, 425 (NY 1985); *Platek v. Town of Hamburg,* 24 N.Y.3d 688, 694 (N.Y. 2015).

### 2. Offset Excluded Under the Contract

Underwriters argues that because DAMAGES under the policies excludes the "reduction of fees, profits or charges for the services rendered or offered by [ProSource]," the Offset is excluded because it represents a reduction of the fees that HTFC owed ProSource for its contract services. Underwriters bears the burden of proving the applicability of the relevant exclusion in the DAMAGES definition. *Platek,* 24 N.Y.3d at 694; *see, e.g., K2 Inv. Grp., LLC v. Am. Guarantee & Liab. Ins. Co.*, 22 N.Y.3d 578, 589 (NY 2014) (Graffeo, J.)(dissenting).[2] In light of the allegations in the Amended Complaint and the language of the Settlement Agreement, Underwriters has satisfied this burden.

ProSource alleges that "the settlement agreement provides that the difference

---

[2]("Our insurance cases have long drawn a distinction between 'noncoverage' and 'exclusions.' Noncoverage involves the situation where an insurance policy does not contemplate coverage at its inception. For example, a homeowner's policy would not provide malpractice liability coverage. Exclusions, in contrast, involve claims that fall within the ambit of the policy's coverage parameters but are excepted by a particular contractual exclusion provision. Hence, a homeowner's policy might contain an exclusion for certain types of water damage to the house.")(interior citations omitted)

between the $24,361,467.00 and the $12.5 million reflects a payment on the Counterclaim of $11,861,467.00, *by ProSource foregoing amounts that it was entitled to collect*." Am. Compl. ¶ 73 (emphasis added). By agreeing to forego amounts that it was entitled to collect, ProSource essentially agreed to "the . . . reduction of fees . . . or charges for the services rendered . . . by [ProSource]." Kohane Ex. 1, at 73. Although this allegation is made in reference to an "agreement in principle" reached before the Settlement Agreement was executed, and the highlighted-language does not appear in the Settlement Agreement, the Settlement Agreement essentially tracks the language of the "agreement in principle" with the substitution of a phrase categorizing ProSource's forgone amounts as "an offset." *Compare* Am. Compl. ¶ 73[3] *with* Settlement Agreement.[4] The use of the noun "offset" in the Settlement Agreement, read in context of the allegations in the Amended Complaint and the terms of the Settlement Agreement, indicates that ProSource agreed to a reduction of its fees and/or costs owed by HTFC as payment on the Counterclaim. *See e.g.*, *Norwalk Cove Marina, Inc. v. S/V ODYSSEUS*, 64 F. App'x 319, 321 (2d Cir. 2003);[5] *Black's On-Line Law Dictionary;*[6] *Legal Dictionary, Law.Com;*[7] *Cambridge On-Line Dictionary*.[8] It can only

---

[3]("[T]he settlement agreement provides that the difference between the $24,361,467.00 and the $12.5 million reflects a payment on the Counterclaim of $11,861,467.00, by ProSource foregoing amounts that it was entitled to collect.")

[4]("The difference between ProSource's [$24,361,467.00] contract claim and the $12.5 million paid to ProSource reflects an offset in favor of HTFC of $11,861,467.00 based upon and allocated to its counterclaim.")

[5]("By definition, a setoff *is a reduction* from an amount otherwise owed.")(emphasis added)

[6]("What is OFFSET? *A deduction*; a counterclaim; a contrary claim or demand *by which a given claim may be lessened* or canceled. The more usual form of the word is 'set-off.'")(emphasis added)(case citations omitted) (https://thelawdictionary.org/offset/, accessed 08/06/18)

[7]("Offset: 1) n. also called a "setoff," *the deduction by a debtor from a claim* or demand of a debt or obligation. Such an offset is based upon a counterclaim against the party making the original claim. Example:

(continued...)

be concluded that the Offset is a reduction in ProSource's unpaid costs and fees and, as such, is excluded from DAMAGES under the Policies.  This satisfies Underwriters' burden to demonstrate the application of an exclusion.  Accordingly, the fist cause of action is dismissed.

### b.    Breach of the Duty to Defend - Second Cause of Action

ProSource's second cause of action alleges a breach of Underwriter's duty to defend, and seeks damages "at least in the amount of the Policies' $7 million limits." Am. Compl. ¶ 91.  Underwriters does not deny that it had a duty to defend on the Counterclaim, but denies that it breached this duty and disputes ProSource's claim that such a breach would entitle it to recover the full policy limits as damages.  Def. Reply Mem. L. at 6. Underwriters argues that ProSource's damages on the duty-to-defend claim are limited to defense costs, and because those costs were paid, the claim must be dismissed.  Def. Mem. L. at 15-16.

Even assuming that Underwriters breached its duty to defend by failing to actively defend on the Counterclaim, *see Isadore Rosen & Sons, Inc. v. Sec. Mut. Ins. Co. of N.Y.*, 31 N.Y.2d 342, 347 (NY 1972),[9] this breach alone does not entitle ProSource to damages up to the Policies' limits.   While in some circumstances an insured may recover damages

---

[7](...continued)
Harry Hardhead makes a claim or files a lawsuit asking for $20,000 from Danny Debtor as the final payment in purchase of a restaurant; as part of his defense Debtor claims an offset of $10,000 for alleged funds owed by Hardhead for repairs Debtor made on property owned by Hardhead, *thus reducing the claim of Hardhead* to $10,000.")(emphasis added)( https://dictionary.law.com/Default.aspx?selected=1389, accessed 08/06/18)

[8] ("Offset: noun, uk / 'ɒ fset/ us, [ U ] LAW, FINANCE: *the right to pay* a person or organization *less money than you owe them because they also owe you money*." )(emphasis added) (https://dictionary.cambridge.org/us/dictionary/english/offset, accessed 08/06/18)

[9](recognizing that refusal, neglect, and unreasonable delay violate insurer's obligations to insured)

up to a policy limit based on an insurer's breach of its duty to defend, *see Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 436  (NY 1972);[10] *see also Isadore Rosen & Sons*, 31 N.Y.2d at 348;[11] *Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust*, 74 A.D.3d 32, 42 (1st Dep't  2010),[12] damages beyond defense costs are available only because of an indemnification agreement in the insurance contract - not because the insurer breached the duty to defend. *See Servidone,* 64 N.Y.2d at 423;[13] *see also, K2 Inv. Grp., LLC v. Am. Guarantee & Liab. Ins. Co.*, 22 N.Y.3d 578 (NY 2014).[14]  To hold an insurer liable for the policy limits on a breach of the duty to defend without also finding that the insured suffered a covered loss would be to "enlarge[] the bargained-for coverage as a penalty for breach of the duty to defend, and this [a court] cannot do." *Servidone*, 64 N.Y.2d at  424.

Because ProSource concedes that Underwriters paid defense costs, *see* Am. Compl. ¶ 78, ProSource has recovered all of the damages it is entitled on the breach of the duty to defend claim.  Accordingly, Underwriters' motion directed to the second cause of action is granted.

---

[10]("For a breach of the obligation to defend, the measure of damage is the cost of defense to the insured and the amount of recovery, if any, against the insured within the policy limits.  For a breach of contract based only on a failure to make reasonable settlement of a claim within the policy limits, damages are measured by the policy limits.")

[11]("The New York rule is that where an insurer unjustifiably refuses to defend a suit, the insured may make a reasonable settlement or compromise of the injured party's claim, and is then entitled to reimbursement from the insurer, even though the policy purports to avoid liability for settlements made without the insurer's consent.")(interior quotation marks and citations omitted)

[12](awarding both defense costs and settlement amount for refusal to defend)

[13]("[A]n insurer's breach of duty to defend does not create coverage and . . . , even in cases of negotiated settlements, there can be no duty to indemnify unless there is first a covered loss.")

[14](relying on *Servidone*, holding that an insurer facing a breach of the duty to defend claim can rely on a policy exclusion to escape its duty to indemnify the insured for a judgment against him)

### c.    Request for Declaratory Judgment - Third Cause of Action

ProSource's third cause of action seeks a declaration that Underwriters' alleged failure to participate in settlement negotiations excused ProSource from having to obtain Underwriters' consent prior to entering into the Settlement Agreement with HTFC, as expressly required by the Policies.  Am.  Compl. ¶¶ 92-96.  Because the first and second causes of action are dismissed, the third cause of action is dismissed as moot.

### d.    Breach of the Implied Duty of Good Faith and Fair Dealing - Fourth Cause of Action

In its fourth cause of action, ProSource contends it is entitled to recover damages "at least in the amount of the Policies' $7 million limits" for Underwriters' alleged breach of the implied duty of good faith and fair dealing. *See* Am. Compl. ¶¶ 98-102.  Citing New York law, Underwriters argues that "because ProSource did not and cannot state a claim for extra-contractual damages, this claim must be dismissed as merely duplicative of the first cause of action for breach of contract."  Def. Mem. L. p. 12.  ProSource counters by arguing: (1) because this case was transferred from Minnesota, the Court must apply Minnesota law to determine whether the breach of the good faith and fair dealing claim falls within the scope of the Policies' choice-of-law clause; (2) under Minnesota law, the claim is outside the scope of the Policies' narrowly tailored choice-of-law clause;[15] (3) applying Minnesota law to the substantive merits of the claim, ProSource has stated a viable breach of the duty of good faith and fair dealing claim, and (4) even under New York law, ProSource has stated a viable claim allowing it to recover consequential damages. Pl. Mem.

---

[15]ProSource argues that this clause does not apply because the breach of the duty of good faith and fair dealing claim does not rely on the interpretation or operation of any terms or provisions of the Policies.

17

L., pp. 21-24.

### 1. Choice of Law

Even accepting ProSource's proposition that Minnesota law applies in making the determination whether this claim is governed by the choice-of-law clause, New York law applies to the substantive merits of the claim.  "Minnesota generally enforces choice of law provisions, applying the substantive law agreed to by the parties." *Katch, LLC v Sweetser*, 143 F. Supp. 3d 854, 865–67 (D. Minn. 2015) (citing *Schwan's Sales Enters., Inc. v SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir. 2007) and *Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n. 1 (Minn.1980)).   Minnesota "is committed to the rule that parties may agree that the law of another state shall govern their agreement and will interpret and apply the law of another state where such an agreement is made." *Milliken*, 295 N.W.2d at 380.   Accordingly, even a narrowly-drafted contractual choice-of-law clause will be found to apply broadly, "not only to contract claims, but also to any tort claims, which are 'closely related' to the terms of the contract, such that the Court would need to interpret the contract in order to resolve the tort claim." *Warren E. Johnson Companies v. Unified Brand, Inc.*, 735 F. Supp. 2d 1099, 1105–06 (D. Minn. 2010) (citing *Northwest Airlines, Inc. v. Astraea Aviation Services, Inc.*, 111 F.3d 1386, 1392 (8th Cir.1997)); *Katch, LLC*, 143 F. Supp. 3d at 865–67.   Thus, any claim closely related to the interpretation of the contract necessarily falls within the ambit of a contractual choice-of-law provision.  *Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1061 (8th Cir. 2003); *Northwest Airlines, Inc.*, 111 F.3d at 1392.

The implied covenant of good faith and fair dealing "serves only to enforce existing contractual duties, and not to create new ones," and thus an alleged breach cannot be

determined without consideration of the contract's express terms. *Watkins Inc. v Chilkoot Distributing, Inc.*, 719 F.3d 987, 994 (8ᵗʰ Cir. 2013)(internal quotation marks and citation omitted). Accordingly, Minnesota law dictates that the Policies' New York choice-of-law clause applies to the breach of the duty of good faith and fair dealing claim inasmuch as resolution of this claim will require consideration of the Policies' provisions. *Holden Farms, Inc.*, 347 F.3d at 1061; *Northwest Airlines, Inc.*, 111 F.3d at 1392.

### 2. Breach of the Duty of Good Faith and Fair Dealing

In New York, all insurance contracts imply a covenant of good faith and fair dealing. *Smith v. Gen. Accident Ins. Co.*, 91 N.Y.2d 648, 653 (NY 1998). This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *ABN AMRO Bank v. MBIA Inc.*, 17 N.Y.3d 208, 228 (NY 2011). It does not create any obligations beyond those expressly stated in the contract, but rather "is an implied duty to use 'reasonable efforts' to advance the contract's primary goals." *Hosp. Auth. of Rockdale Cty. v. GS Capital Partners V Fund, L.P.*, No. 09 CIV 8716 PAC, 2011 WL 182066, at *4 (S.D.N.Y. Jan. 20, 2011)(citing *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 90–91 (NY 1917)). This covenant "includes a promise 'not to act arbitrarily or irrationally in exercising contractual discretion.'" *Hosp. Auth. of Rockdale Cty.*, 2011 WL 182066, at *4 (quoting *Dalton v. Educ. Testing Serv*., 87 N.Y.2d 384, 389 (N.Y.1995)).

"'The implied covenant of good faith and fair dealing is breached when a party acts in a manner that would deprive the other party of the right to receive the benefits of their agreement.'" *CapLOC, LLC v. McCord*, No. 17CIV5788ATRWL, 2018 WL 3407708, at *5

19

(S.D.N.Y. June 12, 2018)(quoting *1357 Tarrytown Rd. Auto, LLC v. Granite Properties, LLC*, 142 A.D.3d 976, 977 (2d Dep't 2016)). To state a viable claim of a breach of the duty of good faith and fair dealing, "the plaintiff must allege not that the contract's express terms were violated but that its purpose was subverted, depriving him of his reasonable expectations." *Hosp. Auth. of Rockdale Cty.,* 2011 WL 182066, at *4. In this regard, a claim asserting a breach of the duty of good faith and fair dealing "'is merely a breach of the underlying contract.'" *CapLOC, LLC*, 2018 WL 3407708, at *5 (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)); *see also Dalton v Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (NY 1995).[16]

A claim alleging breach of the duty of good faith and fair dealing must be dismissed as duplicative where it "arises from the same facts and seeks the same damages as [the] breach of contract claim." *Mill Fin., LLC v. Gillett*, 122 A.D.3d 98, 104 (1st Dep't 2014); *Nyahsa Servs., Inc. v. Recco Home Care Servs., Inc.*, 141 A.D.3d 792, 794–95 (3rd Dep't 2016). Nevertheless, a "plaintiff may bring two breach of contact claims, one based on breach of the express terms and the other based on breach of the implied duty, as long as they are supported by factually distinct allegations." *Hosp. Auth. of Rockdale Cty.,* 2011 WL 182066, at *4.

The breach of the duty to indemnify claim alleges that Underwriters violated its duty to pay ProSource for covered "DAMAGES" as required by the contract. *See* Am. Compl. ¶¶ 79-94. The breach of the duty of good faith and fair dealing claim alleges that Underwriters violated its obligations under the contract to properly defend ProSource on the

---

[16](duty of good faith and fair dealing "is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship")

Counterclaim, thereby forcing ProSource to settle the Counterclaim in a manner that was calculated to result in denial of indemnification.  *See* Am. Compl.  ¶¶ 97, 99-101.[17] The allegations about Underwriters' deficiencies in defending ProSource, including its failure to participate in settlement negotiations on the Counterclaim, are factually district from the allegations underlying the breach of the duty to indemnify claim.  These alleged deficiencies plausibly establish that ProSource was deprived of the benefits it expected of receive from the Policies, and rest upon factual contentions distinct from those underlying the breach of contract claim.[18]  Moreover, even if ProSource's claims "prove to be duplicative, resolution of the issue at this preliminary stage … would be premature" because the full facts underlying the instant claim is not developed.  *Quick Response Comm'l Div., LLC v.*

---

[17]ProSource alleges:

97. ProSource realleges and incorporates the preceding paragraphs as if fully set forth herein.

* * *

99. Underwriters' actions, described above, constituted a deliberate or reckless failure to place ProSource's interests on equal footing with its own interests.

100. The structure of the settlement agreement in the Underlying Litigation is a direct result of Underwriters' refusal to meaningfully participate or assist in settling the Ineligibility Claim and to force ProSource into a position so that Underwriters could contend the Counterclaim was not covered.  If Underwriters had properly participated and provided coverage, Underwriters would have written a check to HTFC to settle the Counterclaim, and the structure used to settle the case would have been unnecessary.

101. As a result, if the settlement is not covered for the reasons Underwriters now contends, including if ProSource's breach of contract claim is not viable due to Underwriter's conduct described above, Underwriters breached the duty of good faith and fair dealing.

Am. Compl. ¶¶ 99-101.

[18]That being the case, the Court need not address whether the two claims seek the same damages. Moreover, because the Court need not address the damages ProSource seeks under the breach of the duty of good faith and fair dealing claim, it also need not address at this time whether ProSource is entitled to compensatory and/or punitive damages, or attorneys' fees and costs. Underwriters can raise these issues at a later time.

*Travelers Prop. Cas. Co. of Am.*, No. 1:09-cv-00651, No. 109-CV-00651 GLS/RFT, 2009 WL 3334600, at*1 (N.D.N.Y. Oct. 14, 2009). For these reasons, Underwriters' motion to dismiss the breach of the duty of good faith and fair dealing claim is denied.

## V.    CONCLUSION

For the reasons discussed above, Underwriters' motion to dismiss [Dkt. No. 81] is **GRANTED IN PART and DENIED IN PART**. The motion is granted in that the first, second, and third causes of action are **DISMISSED**. The motion is denied to the extent it is directed to the fourth cause of action.

**IT IS SO ORDERED.**

Dated:August 10, 2018


Thomas J. McAvoy
Senior, U.S. District Judge

22